Janice Carolyn ROSETTA, Appellant,

v.

Peter Franklin ROSETTA, Appellee.

No. 831.

Court of Civil Appeals of Texas,
Tyler.

July 10, 1975.

Rehearing Denied July 31, 1975.

Bader, Wilson, Menaker, Cox & Branson, Bertran T. Bader, III, Horsley & Wincorn, Gregory C. Horsley, Dallas, for appellant.

Anderson, Henley, Shields, Bradford & Pritchard, W. A. Pritchard, Dallas, for appellee.

McKAY, Justice.

Peter Franklin Rosetta, appellee, brought this suit for divorce from Janice Carolyn Rosetta, appellant, alleging they had a common law marriage as of July 1, 1970, and asking that he be granted a divorce and be appointed managing conservator of their minor child, Theresa Angelique Rosetta (hereinafter called Angie). The trial court heard the case without a jury, and on July 17, 1974, rendered judgment that the parties had a common law marriage, that appellee be granted a divorce, and that appellant be appointed managing conservator of the minor child with appellee granted specific visitation rights.

On July 23, 1974, appellee filed what is titled "Petitioner's Motion for New Trial, Contempt, Etc.," in which he alleged that "prior to and since the trial" appellant caused Angie to be emotionally disturbed, endeavored to alienate Angie's affection for her father and that since trial appellant had totally refused to permit visitation as the Court had ordered. Appellee asked the court to grant him a new trial to the extent that the court appoint him managing conservator of Angie, and alternatively requested that appellant be held in contempt for moving or threatening to move without advising appellee of her new address. The prayer on the motion was "Wherefore, Petitioner prays that upon hearing that the Court award him all of the relief above requested, all costs herein and such other and further relief to which he may be entitled."

The court set the motion for hearing on August 9, 1974, but the record does not reveal that there was any hearing. However, on the setting day, August 9, 1974, the trial court set aside its judgment of July 17, 1974, and rendered a new judgment granting a divorce to appellee and appointing him managing conservator of the minor child, Angie, with an order for appellant to immediately deliver Angie to appellee, and setting out specific visitation rights to appellant. It is from this second judgment that appellant brings this appeal.

Appellant filed a motion to set aside the judgment, and later a Motion for New Trial, both of which were overruled. Findings of fact and conclusions of law were requested and filed by the trial court.

We are met at the outset with a motion by appellee to dismiss the appeal based upon findings numbered 19 and 20 made by the trial court, and also upon an affidavit

made by appellee. We overrule the Motion to Dismiss.

Findings Nos. 19 and 20 are as follows:

"19. Since the date of the Judgment herein on August 9, 1974, Respondent's attorney had advised the court that Respondent took the minor child to Paducah, Kentucky, and left her with her mother, where the Court understands said child is at this date.

"20. As of this date, Respondent has completely ignored the terms of this Court's judgment concerning delivery of the minor child to Petitioner and has refused to allow Petitioner to visit with her."

■ Appellee argues that since findings 19 and 20 of the trial court are not challenged on any point on appeal, they are binding upon the parties and must be accepted by the Court of Civil Appeals citing *Curtis v. National Cash Register Co.,* 429 S.W.2d 909 (Tex.Civ.App.—Amarillo, 1968, writ ref'd, n. r. e.) and cases there cited. We do not disagree with this rule; however, the two findings upon which appellee relies are obviously not based upon evidence presented during the trial of the case, but they are, as so found and stated by the trial court, based upon information presented to the judge by one of the attorneys after the trial. Under such circumstances we are not bound by the rule stated in *Curtis.* Findings of facts which occurred after the case was heard by the trial court, and which are not supported by the record, are not binding upon this court even though unchallenged. We are without jurisdiction to determine or pass upon questions or irregularities which may have occurred subsequent to the judgment appealed from and not shown in the record. *Brown County Life Ins. Co. v. Hagins,* 110 S.W.2d 1162 (Tex.Civ.App.—Amarillo, 1937, no writ). Moreover, these findings have nothing to do with the power of this court to ascertain the status of its jurisdiction of the case. *Ragland v. Cone,* 118 S.W.2d 1098 (Tex.Civ.App.—Amarillo, 1938, no writ).

■ Appellee attached to his Motion to Dismiss his own affidavit concerning the acts of appellant after the judgment appealed from was rendered. The only matters which we are authorized to consider upon affidavits are those which involve the exercise of our jurisdiction. Art. 1822, Vernon's Ann.R.Civ.St., *Brown County Life Ins. Co. v. Hagins, supra.* Appellee's affidavit does not concern our jurisdiction and is therefore not considered.

In appellant's first two points complaint is made that the trial court erred in finding there was a common law marriage because there is no evidence, or insufficient evidence, (1) that there was a contract between the parties to be married, and (2) that the parties held themselves out or represented to others that they were husband and wife.

■ In passing upon a no evidence point we must consider only the evidence and the inferences therefrom tending to support the findings of the trier of the facts and disregard all evidence and inferences to the contrary. *Garza v. Alviar,* 395 S.W.2d 821 (Tex.1965).

■ When it is contended that the evidence is insufficient to support a fact finding a court of civil appeals must examine all of the evidence and reverse and remand for a new trial if it concludes that the evidence is factually insufficient to support the findings of a vital fact. Calvert, "No Evidence" and "Insufficient Evidence" Points of Error, 38 Tex.L.R. 361, 366 (1960).

Appellant and appellee were married in a ceremonial marriage in Paducah, Kentucky, on December 27, 1965. Angie Rosetta, the minor child, was born to the parties on April 15, 1967. Appellant and appellee were divorced by judgment of Domestic Relations Court No. 3, Dallas County, on November 21, 1969, and appellant was awarded the house in which they had lived and custody of the minor child.

Appellee testified that he and appellant began to live together again about July 1, 1970, in the house formerly occupied by them. He further testified that they lived together there approximately three years, that they agreed to resume living together as man and wife, and that they slept in the same bed. He said "We just agreed to move back together and resume the relationship." He also testified during this period he introduced appellant as his wife and she introduced him as her husband. They separated May 15, 1973, by appellee leaving the house. On August 11, 1973, appellant was ceremonially married to Jim Woods.

Appellee testified that during the time they lived together they continued to use a joint bank account used before the divorce by each of them writing checks on it; that appellant paid most of the bills and that she filled out their income tax returns for 1970, 1971, 1972 and 1973, but they were not joint returns, but separate individual returns. He further said that he was not aware that their conduct constituted a common law marriage until his lawyer told him, and that he and appellant talked about remarriage a few times to the effect that they would remarry sometime in the future. These questions and answers appear in the record:

"Q. Okay. But, you did talk about sometime in the future remarrying, isn't that right?

A. Yes.

\* \* \* \* \* \*

Q. Didn't have any agreement between you in July of 1970 to be man and wife, did you?

A. Well, I considered myself to still be married to her."

Appellee later testified:

"Q. Didn't you all have an agreement, one time, when you got ready to move back in the house that you asked her for a trial living together so that you might marry sometime if it worked out?

A. Back when we first, just before, we moved in together, we discussed the possibility of a trial situation between the two of us.

Q. So to see if some day you might marry in the future, isn't that right?

A. Yes, go through a ceremony.

\* \* \* \* \* \*

Q. Did you not tell me on—during cross-examination two days ago that you entered this household under an agreement to marry in the future? Isn't that what you told me, right there?

A. I said that we might have an agreement to marry in the future.

Q. That's right. An agreement to marry in the future and I asked you specifically that and you said, yes, that is right. Then, just a few minutes ago, you told me that you agreed to be married when you entered into the house.

A. As far as I was concerned, we were still married.

Q. That's the point. Isn't it a fact you always thought you were still married, isn't that right?

A. That is right.

\* \* \* \* \* \*

Q. If you didn't consider yourself divorced, why would you enter into an agreement to marry?

A. Just for the ceremony.

\* \* \* \* \* \*

Q. But, you had no intent to presently be husband and wife? You were going to marry in the future, isn't that right?

A. We had intent to be husband and wife.

Q. Then, why would you make an agreement to marry in the future?

A. She said we might.

Q. Might marry in the future, right?

A. Yes.

\* \* \* \* \* \*

Q. Okay, you also agreed to be married in the future, ceremonial, is that correct?

A. I didn't agree to it.

Q. But, that was Janice's condition, wasn't it?

A. Not a condition, no.

Q. What was it, then?

A. It was a maybe.

Q. A maybe you would marry in the future?

\* \* \* \* \* \*

A. Yes.

\* \* \* \* \* \*

Q. With reference to this business about marrying in the future, explain what that term meant? I mean, what were you talking about?

A. Marrying in the future?

Q. This—let's get our time frame right. Before you commenced living together again, on or about July 1st, 1970, and you said you had this conversation when she said, maybe we'll marry in the future?

A. Yes.

Q. Did she say the statement that she would be your wife?

A. No. It was a little while later.

Q. What was she talking about? I mean was she talking about going before a preacher or—

A. Yes, a preacher, going before the preacher.

Q. Is that what you understood it to mean?

A. That is what I understood it to be."

Witnesses Jim Leonard and Wm. C. Henderson, Jr. testified appellant introduced appellee as her ex-husband. Joyce Thomas, appellant's sister, testified she lived in the house with appellee and appellant from July, 1972, until appellee moved out in May, 1973, and that appellant had dates with other men during this period, and when appellant married Jim Woods in a ceremonial marriage on August 11, 1973, appellee baby-sat with Angie. She further testified she never heard either appellee or appellant introduce the other as wife or husband.

Appellant testified that after the divorce from appellee in 1969, she moved out of the house in April, 1970, and that appellee moved in the following June, and that she gave her permission. She also testified that appellee attempted suicide in August, 1970, and told her he could not go on living without her and Angie, that he loved her and did not consider their divorce valid and that she moved back into the house. She said appellee asked her to remarry him and things would be better, but she told him she could not remarry him, and that there was no agreement between them to be husband and wife or to live together as husband and wife, but that she told appellee if he would get medical help or marriage counselor help and get straightened out and take care of himself she would consider remarrying him. She further testified they had separate bedrooms until July, 1972, when her sister moved in, and that she had sexual relations with appellee only twice while they were living in the house.

Appellant also testified she was not covered by appellee's hospitalization policy when she was in the hospital as the result of an automobile accident for one month in 1973, and that appellee did not pay any of her bill. She further said appellee told a caseworker for Buckners in 1971 that they were not married, but might remarry if their problems were resolved, and that she told her own lawyer who represented her on her accident case that she was single.

Sec. 1.91 of our Family Code, V.A.C.S., provides:

"(a) In any judicial, administrative, or other proceedings, the marriage of a

man and woman may be proved by evidence that:

(1) * * *

(2) they agreed to be married, and after the agreement they lived together in this state as husband and wife and there represented to others that they were married.

"(b) In any proceeding in which a marriage is to be proved under Subsection (a)(2) of this section, the agreement of the parties to marry may be inferred if it is proved that they lived together as husband and wife and represented to others that they were married."

Sec. 2.01, Family Code, V.A.C.S., provides in part:

" * * * When two or more marriages of a person to different spouses are alleged, the most recent marriage is presumed to be valid as against each marriage that precedes it until one who asserts the validity of a prior marriage proves its validity."

In finding No. 12 the trial court found that after May 15, 1973, appellant "thereafter began to live with a man by the name of Jim Woods and she was living with him at the time of trial, together with the minor child of the parties," but the trial court failed to find that appellant had a ceremonial marriage with Jim Woods on August 11, 1973, which fact is undisputed in the record.

It is noted that it is provided by the Family Code that there is a presumption in favor of the most recent marriage when there is an allegation of two marriages to different spouses. We are of the opinion that the evidence in the record is factually insufficient to overcome the presumption in favor of appellant's August 11, 1973 marriage to Jim Woods, and therefore is insuf-

ficient to establish a common law marriage between appellee and appellant.

Appellee maintains that where there is evidence of probative value to support the findings and judgment of the trial court, they are controlling on this Court, citing *Waters v. Waters,* 498 S.W.2d 236 (Tex.Civ.App.—Tyler, 1973, writ ref'd, n. r. e.). The *Waters* case does indicate that in a non-jury case where the evidence is conflicting, but where there is evidence of probative force, the findings of the trial court will not be disturbed. However, the findings of fact in a case tried without a jury are not conclusive on appeal when a statement of facts is in the record as in this case even though such findings are not excepted to by appellant. *Swanson v. Swanson,* 148 Tex. 600, 228 S.W.2d 156 (1950); *Anderson v. Anderson,* 503 S.W.2d 124 (Tex.Civ.App. —Corpus Christi, 1973, no writ); *Barnwell v. Fox & Jacobs Const. Co.,* 469 S.W.2d 199 (Tex.Civ.App.—Dallas, 1971, no writ); *Forbes v. Forbes,* 430 S.W.2d 947 (Tex.Civ. App.—Amarillo, 1968, no writ); *Kroger Co. v. Warren,* 420 S.W.2d 218 (Tex.Civ.App.— Houston (1st), 1967, no writ); *Intercoast Jobbers & Brokers v. Barber,* 410 S.W.2d 249 (Tex.Civ.App.—El Paso, 1967, reversed on other grounds, 417 S.W.2d 154); Rule 373, Texas Rules of Civil Procedure.

Long before the presumption of the validity of the most recent marriage, when two marriages of a person to different spouses is alleged, was enacted by the Legislature in the Family Code, appellate courts in Texas were indulging such presumption. In a similar case but one where the evidence was much stronger on the elements of a common law marriage, the court in *Hodge v. Hicks,* 229 S.W.2d 893 (Tex.Civ.App.—Dallas, 1950, affirmed, 149 Tex. 390, 233 S.W.2d 557) held:

"We are not unmindful of the presumption of marriage from cohabitation and reputation and, as in this case, the legiti-

macy of a child as a result of that relationship. But that presumption is overcome by proof of a subsequent ceremonial marriage, since the presumption of the validity of such ceremonial marriage is stronger than the presumption of the previous marriage by cohabitation and reputation."

Long before *Hodge v. Hicks, supra,* the Supreme Court approved the opinion of the Commission of Appeals in *Walton v. Walton,* 228 S.W. 921 (1921) wherein it is said:

"Nor does the evidence showing a living together as husband and wife, and common reputation, conclusively establish the fact of marriage, where there is also evidence that later there was a separation between the parties, and one of them was thereafter actually married by ceremonial marriage to another person. The presumption of marriage based on habit and reputation is in such case, overcome by proof of the ceremonial marriage."

In *Schacht v. Schacht,* 435 S.W.2d 197 (Tex.Civ.App.—Dallas, 1968, no writ) it is said "A ceremonial marriage entered into in accordance with legal form will raise the presumption, or inference of its legality. *One of the strongest presumptions of law is that a marriage, once being shown, is valid."* (Emphasis added.)

In *Middlebrook v. Wideman,* 203 S.W.2d 686 (Tex.Civ.App.—Texarkana, 1947, no writ) it was held that where it is claimed a common law marriage existed the act of the woman in marrying another effectively rebutted any inference that might have been drawn of a common law marriage, and quoted 18 R.C.L., p. 434: " 'An inference of marriage will be overcome where the parties separate and one of them, while the other is known to be alive, marries or cohabits with a third person.' "

*"The presumption in favor of validity of the second marriage, notwithstanding the prior common-law marriage, 'is one of the strongest, if, indeed, not the strongest, known to law',* and *may even outweigh positive evidence to the contrary."* (Emphasis added.) *Mullinax v. Mullinax,* 447 S.W.2d 428 (Tex.Civ.App.—Waco, 1969, no writ); *Texas Employers Ins. Assn. v. Elder,* 155 Tex. 27, 282 S.W.2d 371 (1955); *Pacific Employers Indemnity Co. vs. Aguirre,* 431 S.W.2d 33 (Tex.Civ.App.—Waco, 1968, writ ref'd, n. r. e.).

We therefore conclude that appellant's ceremonial marriage to Jim Woods in August, 1973, must be presumed valid as against her earlier alleged common law marriage to appellee. Because the presumption of validity of a ceremonial marriage is stronger than that of a previous common law marriage, appellee had the onerous burden of providing sufficient evidence to support his allegation of the formation of a common law marriage.

From the entire record the most that can be said is that there may have been an agreement that after some trial period, if things worked out, or if appellee got medical help or counseling, then the appellant and the appellee might remarry. Present agreement to be married is a necessary element of common law marriage, and it is not sufficient to agree on present cohabitation and future marriage. *Gary v. Gary,* 490 S.W.2d 929 (Tex.Civ.App.—Tyler, 1973, writ ref'd, n. r. e.).

Consequently, we feel that the no evidence points should be overruled, but that the evidence presented in the record is factually insufficient to prove the existence of a previous marriage by common law and the insufficient evidence points are sustained.

It might be pointed out that appellee filed a motion to modify the visitation order on February 20, 1974, alleging that the par-

ties were divorced on November 21, 1969, and asking the court to set specific visitation rights. In response to such motion appellant filed motions for increase in child support and for contempt for failure of appellee to pay child support payments totaling $2800.00, and then, appellee, for the first time, alleged there existed a common law marriage by filing what he called "Respondent's Reply to Petitioner's Motion for Contempt" on April 1, 1974, seemingly as a defense or an excuse of failure to pay child support as ordered in the divorce decree. One week later, on April 8, 1974, appellee, in the same case, filed petition for divorce based on a common law marriage. Appellee also testified he did not know there was a common law marriage until his lawyer told him.

In view of our holding that the evidence is insufficient to overcome the presumption of the validity of the ceremonial marriage of appellant and Jim Woods we do not reach appellant's other points having to do with custody of the minor and the alleged abuse of discretion of the trial court. We feel constrained to point out, however, that the findings by the trial court of events which took place after the trial and which were not in the record and which were reported to him by some one after the trial should not have been made and it was not proper to include them in the findings. The trial court found in finding No. 17: "Since the trial of this case and the announcement of the Court's judgment of divorce herein, Petitioner (appellee) and Charlotte Deruska have married, both of whom have normal personalities and are in good health," and found in No. 18 "That Petitioner and his wife can provide a more stable home for the minor child than Respondent and it would be in her best interest to award the custody to Petitioner."

Judgment of the trial court is reversed and the cause is remanded.